Good morning, counsel. I'm Judge Dennis together with Judge Weiner and Judge Duncan. We're your panel on this case today, which is the United States of America v. Rock Anthony Hill. We have four attorneys to argue on the defense side, and I assume you have that list and allocation down and you'll follow it. That being said, we'll call the first attorney, Susan Clothier. Hi, Your Honors. My name is Susan Clothier. I represent Benny Charles Phillips Jr. in this case. I've been tasked to address the crime of violence statute and whether or not it applies to attempted hostage robbery. The government, in its brief, had indicated that it believed that this has been settled. I would make the argument that it has not yet been settled. The case in which was argued by the government was Smith. That had to do with holding attempted murder as a crime of violence. It's going to possibly have a different outcome when you look at the elements of the statute, Attempted Hobbs Act Robbery. I think the problem and the difficulty of doing this analysis is when Davis came out last 2019, they made it very clear that it was problematic for people to be sentenced and convicted pursuant to the residual clause of 924C. They also instructed that we do a categorical analysis instead of looking at the facts of the case to determine whether or not the underlying crime can be a predicate effect for 924C. The court, however, did not give us a list of which crimes were which, so we have to do this very convoluted analysis. It's pretty clear by Fifth Circuit precedent that we start with the modified categorical approach because this statute is divisible. When we get it down to the actual elements of the statute, we're looking at the intent to commit robbery and then a substantial step toward commission of the robbery. Where some of the confusion lies is the way that we determine whether or not, in the true categorical analysis, whether or not it can be used as a predicate offense, we have to look at the least conduct that the government has to prove in order to get that conviction. The situation with attempted cases such as this is we don't have to prove as an element of the offense that they attempted anything. We just have to prove intent, which is more ninth of state of mind than threat. Attempt is the actual action. When you're dealing with the elements clause, it defines an attempted use or threatened use of physical force against the person or property of another. That includes the actual conduct of the individual, not the conduct of our particular individual, but the least conduct that is required to prove that someone's guilty of that offense. Therefore, instead of looking at the intent, we have to look at the actual conduct. The actual element intent to commit a hijack robbery does not go towards this analysis at all. It's actually going to be the substantial step element that we have to analyze. If the government can prove and someone can be convicted of attempted hobstack robbery and that the substantial step does not include a violent act, then this cannot be a predicate offense for the attempted hobstack robbery. In Smith, the court had cited to a couple of out-of-circuit cases, one was Dominguez and the other one was St. Hubert. Dominguez basically came to the conclusion that when the substantive offense would be a crime of violence, an attempt to commit that offense is also a crime of violence. Then Hubert basically also focused in on the intent of the individual to commit all the elements of the completed crime. The problem is that that does not talk about the actual conduct of the offender or what has to be shown. It just shows about the events right at the offender. Those specific cases actually do not use the categorical analysis correctly. We have to ignore the actual facts of the case. We have to ignore the mens rea of the defendant or what defendant might be actually convicted under the offense. We only have to look to the least conduct that needed to be proven in order for the defendant to be convicted. Here, to take a substantial step, there's been numerous cases where the substantial step has been found and taken when the offender did not actually do anything. For instance, there was a case in the First Circuit talking about basically the defendant had, it was actually a similar situation where they were looking at robbering an armored car. The defendant gathered all the necessary weapons, he planned the robbery, drove to the parking lot, laid in wait, and then aborted the plan at the last minute. That still constituted a substantial step, but there's nothing violent about that. There's nothing that could be, none of that conduct could be considered attempted violence or violence. Because the government could come to the, they could prove somebody was guilty of attempted object robbery without proving violence, there's no way that it can be used still as a predicate offense for the 924C. That means that that 924C conviction needs to be vacated. I don't want to waste all of my time on this. I want to go toward one of our individual issues that doesn't come up in the other appellants is the insufficiency of the evidence. Here, we have to actually show, the government has to show that he intended to commit the act and that he took the substantial step. The substantial step is actually more than mere preparation. You can't just prepare to do something and have to actually take the substantial step. There's a delineation of which is which. The case that the government cited in its response repowered concern to conviction for engaging or coercing a minor to engage in illegal sexual activity. That particular offense, as an element of the offense, focuses more on the intent of the individual. The substantial step is based on their actual intent. In this case, this particular statute does not have that requirement. It actually requires a substantial step in their conduct. Taking all the evidence, the most favorable to the government, the list that they provided in their brief, that my client recruited Duncan Bush, attended the initial planning meeting, cased the bank at a prior date, delivered a phone, dropped Duncan Bush off before and after at the hotel, told the ringleader it was still a go, and then dropping Duncan Bush off at a hotel. These acts do not rise to the level of substantial step. They do not go past mere preparation. And it goes back to that case in the First Circuit that I had referenced earlier. The courts normally, when they're looking at cases involving robberies on their cars, they look at whether the defendant laid in wait, whether they were at the scene. Mr. Phillips never showed up to the scene at all. Whether or not he had been involved in some of the mere preparation is possible. And we're not conceding that, but some of the evidence points to that. But they didn't go past that into taking a substantial step towards committing the elements of the attempted offense. I'd like to skip over the motion to sever, since that's specific to our case as well. The government had argued that any of the evidence or most of the evidence introduced at this trial would have been introduced and available to be used as evidence in a separate trial against Mr. Phillips. But that's entirely untrue. There were two separate acts that occurred. There was the first robbery that resulted in someone being shot and killed, and then a second attempted robbery that nothing happened. There was no evidence introduced that he had anything to do with the first one. So there was a case, Cortina, that involved 28 members of a conspiracy. It was a drug-related case, but it's similar and analogous here, where some of the members arrived and shot up a house that killed a 14-year-old boy. The appellants were all tried together, but the court found that while co-conspirators should generally be tried together, in this particular case, two of the motions to sever should have been granted because those individuals were not involved in the shooting death, and that the limiting instructions were not adequate to mitigating the prejudicial effect of the violent activities of those other defendants. I believe that that's extremely similar to our case here. Phillips was prejudiced highly by the inflammatory and very violent acts that were brought in as evidence during the trial that he had absolutely nothing to do with. There's no amount of limiting instructions that could get a reasonable jury to disregard all of those violence in order for them to just specifically look at Phillips and what his actual alleged conduct was in the trial. Does anyone have any questions on what's going on? I'll ask you one. I cannot recall. Did your client ever seek to separate and not be tried together with his co-conspirator? Yes, Your Honor, he did. They filed a motion to sever, and it was denied. Okay. And then, you know, back to the insufficient evidence, I'd like to go back to the 924C. For whatever reason, the court determines that our arguments are not correct, and they deem it as a crime of violence. There's not sufficient evidence to have convicted Phillips for this either. You know, advanced knowledge is not the standard to whether or not someone can be held liable for a crime of violence or a weapon. Knowledge alone is not sufficient. They actually have to prove that they had access. Viewing the evidence in light most favorable to the government, most Phillips may have had advanced knowledge that a weapon might be used, but that's not enough to support a conviction for 924C. Your client is Phillips? Is that right? I'm sorry, could you repeat that? Phillips. Phillips, yes. And he was not involved in the first robbery? No, Your Honor, no evidence was introduced at trial that he had any involvement at all. In the second robbery, the attempted robbery, he was not at the scene. There was some evidence introduced by his co-conspirator and a cellmate that he had some involvement, as far as maybe mere preparation of that offense, but there was no evidence that he was at the scene. The FBI testified they did not see him there. So I think if you have any other further questions, I'll reserve my three minutes for rebuttal. You've used up all your time. You'll have some time when we're done. Thank you. Mr. McGuire for Mr. Scroggins. May I ask, is that right? Yes, Your Honor. Good morning, Your Honors. May it please the court and opposing counsel. I wanted to focus on two issues primarily, Your Honor, the 924C issue and then the murder cross-reference issue. On the 924C issue, the court, I'm sure, is very familiar with the categorical approach and the least serious method of committing the offense. I would point the court's attention to the Taylor decision out of the Fourth Circuit, which I think analyzes the statute properly and correctly. It is a simple statutory construction argument that the way the attempted Hobbs Act robbery statute is written as allowing attempted threats to commit the least serious form of the offense, such as sitting in a parking lot with a note that you're planning on passing a bank, which would constitute the threat and sitting in the parking lot about, you know, to enter or considering entering or loitering in the parking lot. There have been many prior cases where defendants have been convicted of attempted Hobbs Act robbery under those facts. So that meets the Duenas-Alvarez test of reasonable possibility or probability of conviction. But going to the elements of the 924C offense, it's attempted use of force for threatened use of force. The simple definition in 924C does not allow for attempted threats of force. But you can be convicted in the least serious manner, least serious way of committing attempted Hobbs Act robbery of attempted threat of force. So that's why under the least serious approach of the categorical approach, as the Fourth Circuit pointed out in Taylor, attempted Hobbs Act robbery just cannot be a categorical crime of violence. And for that reason, the 924C conviction for Mr. Scott should be reversed. If the court has any questions on that issue, I'd be happy to address them now or I can proceed to the next issue, which is the murder cross reference. And on the murder cross reference, I'd like to focus first on whether this issue was preserved. And the government asserts that it was not. We assert that it was on the basis of the defendant objected in writing and at the hearing to application of the murder cross reference. That's sufficient under the Supreme Court's case of Holguin-Hernandez to ask the court to not apply the murder cross reference. That's sufficient to preserve the error under Rule 52. Additionally, as we argued in our reply brief, the Supreme Court has for a long time applied what they call the mere enlargement doctrine. Which so long as a claim is made in the lower court, in the court below, which here it was that the murder cross reference not be applied, you can raise additional arguments in support of that claim on appeal. And that is a preserved claim. You're allowed to raise additional arguments, and that's what we've done here. We've just raised an additional argument in support of the basic claim, which is that the murder cross reference should not be applied to Mr. Scott. Counsel, I agree with you that application of the murder cross reference presents some tricky issues. But isn't it a problem where your argument that the district court expressly said it would have imposed the same sentence even without the cross? Yes, it is, Your Honor. And we concede that that would be harmless error if the court doesn't grant the 924C objection. If the court grants the 924C objection for the reasons we argued, the statutory cap would be 20 years, and therefore I don't think in that situation it would be harmless error. I got you. Thanks. But regarding the substantive law on the murder cross reference, as we pointed out in our brief, in our reply brief, there's two theories that the state courts and not so much the federal courts, but the state courts clearly have grappled with, the common law grappled with, which is the approximate cause theory is the minority view, and I forget the name of this comment. The agency theory. The agency theory. Excuse me. Thank you, Your Honor. And the agency theory is the majority rule. Also, we believe, for the reasons we argued in the brief, it's the common law rule. It's the rule that was applied in the treatises that we cite, East, Hawkins, Blackstone. I pointed out to the court, I believe it was in the East treatise, but it's in appendix A of our brief, that this exact issue was addressed in the common law hundreds of years ago in the dueling context where a person who was the second of the party C was – the person that he was second to in a duel, and the court said, no, that's just not murder, because he had no intent to commit murder. And this court has said repeatedly that 1111 is a codification of that common law rule, and it's consistent with the agency theory. So we think this issue is preserved. We think the court should adopt the majority rule, which is the agency theory, and if a court strikes the 924C count for the reasons we've argued, then it would be harmful error in this case. If the court has any other questions on that, I'm happy to address them. Your Honor, I'm sorry. I couldn't understand you. I was calling the name of the next attorney. Good morning, and may it please the court. I'm Brittany LaCaia, and I represent Alan Nelson, Eleanor Pope. I want to focus my argument on the Confrontation Clause issue regarding whether the district court erred by allowing the extraction report into evidence through a special agent with the Federal Bureau of Investigation who did not personally observe or perform the extraction in violation of the Confrontation Clause. Forensic extraction of data is not machine-generated, but is expert-generated because it requires special training and expertise to perform accurately and reliably. Forensic data extraction expert testimony is no different than forensic gas chromatography and bull cumming or forensic drug analysis expert testimony and Melendez-Diaz. It is testimonial under Crawford, Melendez-Diaz, and bull cumming, and the expert testimony, reliability, and results of the extractions must be subject to confrontation. Just as the expert testing results in Melendez-Diaz and forensic blood alcohol testing results in bull cumming are subject to confrontation. Counsel, with respect to this issue, is there a distinction between the machine-generated list of numbers, which as I understand it is tens of thousands of pages, or thousands of pages, between that and the culling down the numbers, culling down from this list the numbers that correspond, that are relevant? Which one are you talking about? Are you talking about the machine-generated list or the list that was culled down for trial purposes? We're talking about the machine-generated list, which is the original extraction report. Okay, well, does that just spit out a list of numbers? And that's where the issue is, is that this is a Celebrate device that is used with this. This requires extreme training, and that's why I called that letter, the 28-J letter, citing the training that's required for the Celebrate. It's similar to the training that's required for the chromatography. My question is, does it spit out a list of numbers? Admittedly, the list would have to be authenticated, right? But does the machine, the Celebrate, I mean, I was on a panel about Celebrate in the search context in another case, but does it spit out a list of numbers? I mean, I've got them here from the record, and it lists the party, the time, the timestamps, the status, and the message. Is that what Celebrate spits out? Well, Your Honor, that is not in the record on appeal. There's no evidence in the record on appeal that this is machine-generated or that those results are just spit out by a machine. I know, but I've got the extraction report here in the record. Right, but there's no evidence in the record on appeal on how that extraction report was generated using the Celebrate machine. I don't think the government has proved that this was a machine-generated report, simply raw data. The Celebrate machine requires the analyst to determine what tests are run, and the output of that Celebrate can be modified by the analyst. So we don't know if he modified the results before that, and it can also be condensed into a readable format, so that also could have been done. We don't have the expert who did this analysis to testify about whether or not this is raw machine information. But would you agree that if it just spits out a bunch of numbers, and that list is authenticated, then that's not a confrontation clause? I mean, I thought Justice Sotomayor's opinion, either Bill Comey or Melinda Zia specifically, said, look, we're not addressing just a machine-generated list. We're generating an analyst's certification of a result from, you know, like a forensic blood report or blood alcohol report. Your Honor, I believe that Justice Sotomayor, what she was stating is that they're not deciding. She said, we do not decide whether, as the New Mexico Supreme Court suggests, the state can introduce, assuming an adequate chain of custody, raw data generated by a machine in conjunction with the testimony of an expert witness. So they didn't say that the opinion would have been different. They just have not decided that issue. Why would a machine-generated list, just spitting out a bunch of numbers, be testimonial? I think that it could come down to, in that situation, which we're not conceding it's a situation in this case, but in that situation, it could come down to whether or not that's easily verifiable. Like what was the situation in Littorato, where it was the Earth coordinates with a task that they could easily plug in, and the judges were able to plug that in themselves and take judicial notice of the task that came in. That's easily verifiable. This isn't easily verifiable. This is something that requires expertise. This is something that requires technology that costs thousands of dollars. This isn't just something that you can plug into a calculator and can be verified by the average layperson or by the judges on appeal on a case. This is something that people require training and certification to be able to conduct these analyses. We don't know what analyses this person conducted. We don't know what they celebrate. They get error messages while they're performing these analyses. We don't know if error messages came up while they were conducting these tests and what they had to do to get around those error messages. We don't know if they had to hack into the phone or whether or not they had the password for the phone. We don't have evidence about whether or not that could alter or damage the phone. There's just a lot of information that was not presented because we didn't have the person that prepared these reports. So, did that answer your question? Oh, sort of. I mean, we had an agent there, Coughlin. I mean, I understand your argument is he's not the one who ran the extraction from the machine. But didn't he, well, I've got two questions. Are you saying that this report with respect to each of the phones isn't authenticated? Meaning we don't know what it purports to be. Whether it purports to be what it actually is. There's a different objection than hearsay competition. Right. We're not arguing authentication. We're not arguing the reliability of the Celebrite device itself. We're arguing our lack of ability to confront the analysts in this case. And I believe your issue with him being another analyst testifying, Coughlin testifying, regarding the extraction reports. I think that's an argument that was covered by Bullcoming where they had another expert testify instead of the expert that conducted the graph chromatography in that case. And they said that that surrogate testimony was not sufficient. Ms. Arcoyo, is there in your brief or anywhere in the record a description of how this extraction is supposed to be done? No, Your Honor, because that was not introduced by the government at the trial. So there is nothing in the record on appeal regarding how the extraction was performed in this case. That is something that we would have wanted to cross-examine the analysts who performed the extraction regarding. But did you object to the absence of such a description? We objected to our ability to cross-examine the analysts regarding the testing that was performed in this case and what exact testing was performed. That objection was made in the trial court. Did the government acknowledge that there was an absent analyst, that the analyst was absent? Yes, Your Honor, that was acknowledged, but they argued that Coughlin was there to testify and that he, in essence, would be able to testify because he had the report. They argued that he had compared the phones to the extraction report. That was an argument made by the prosecutor at trial. But there was no testimony by Coughlin that he compared the phones to the extraction report to verify that it was the same information. So Coughlin never actually did testify to that. That was just an argument made by the government. What was your reference to the Supreme Court's bull coming? How did that affect this? Well, in bull coming, they had another analyst that testified to the gas chromatography results. And recognizing the admission of the blood analysis dependent on live in-court testimony by a qualified analyst, the New Mexico Supreme Court believed that that analyst could substitute for Kaler because Rosado's qualified as an expert witness with respect to the gas chromatography machine and the laboratory procedures. But surrogate testimony of the kind that the analyst was equipped to give did not convey what the original analyst who did the testing knew or observed about the events of certification concerns. But the particular and testing process that he employed nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part. And that's what we have here is one analyst who didn't perform the extraction reports in this case testifying instead of the analyst that did the extraction reports on these phones. Thank you. Thank you. Thank you, Mr. You have some time. Thank you. No, that's not so as well. Yes. Yes, sir. Ralph Martinez for Mr. Mark Hill. Good morning, Your Honor. Good morning to the court. Your Honor, I would like to first point out that on two of my issues, the denial, my allegation that the court erred in denying my client's right to self-representation as well as his removal from court are based on the same awkward facts and the same incident. And the same analysis to some extent applies. So I kind of like to treat them both jointly. Both the right to represent yourself as a defendant and to be present in your trial is a fundamental right. The courts have said that with respect to the self-representation structure of the second amendment and it's embedded in our jurisprudence with respect to the presence of trial. The courts require extreme caution in removing the defendant and requires serious obstructionist conduct. In fact, in perhaps indicative in Illinois v. Adams, the court said that perhaps gagging and binding a defendant is preferable to outright removal. There was a disruptive event. I do not deny that. My client objected to the fact that his wife was removed from the courtroom and the court did tell him to desist from that behavior. And to a limited extent he did not. And so I would concede that. To warrant either the termination of his right to self-representation or his removal. Firstly, I would contend it was an emotional, impulsive response in a very stressful trial by this man. And the court acted perhaps prematurely in particular because the court refused to even let him address the issue in the record or seek an explanation. And my client became frustrated. But it was not a calculated... But then the court simply refused to allow him to address the jury. He was eventually... I'm sorry, sir. Eventually that happened. That's quite a bit different from what you were saying. Right. But at first he tried to address the court. My client did. And the court did not answer him. So then he asked to address the jury. So that's correct. Eventually he came to that point. So it was not a calculated, strategic, intentional act on my client's part. And the case law says that is crucial in this analysis. He did it impulsively, not deliberately. Other factors the court might consider in whether or not the court acted prematurely with respect to both issues is my client has shown no prior... There was no prior manifestation of any disruption or lack of cooperation in any way throughout the trial. The trial was... It was just the beginning, but he had behaved himself up to that point. Also, the court might want to consider he strongly asserted his right to represent himself and implicitly remain in the courtroom. He also was prejudiced to the extent that once the jury saw him participate in the trial, albeit to a limited extent, engage in opening argument. He asked him questions. It just had him removed from the jury. And the court did instruct the jury to disregard it. But nonetheless, that became somewhat prejudicial. In fact, with respect to the denial of the self-representation, no harm need be shown. Now, a very important thing in this case is that my client did have standby counsel. And the court did not utilize standby counsel to try to ameliorate the problem. The court could have called a recess and let standby counsel talk to my client. And in return, the client could have given the court assurances that he would abide by the protocol. That didn't happen. So standby counsel was not used by this court in attempt to deal with the situation. In fact, after the denial of representation had been made and my client had been removed, he was in fact allowed to return after standby counsel talked to him. And there were no further incidents thereafter, which suggests that perhaps if the court employed that before the denial of his representation, things would have been okay. Now, the point is that this was an isolated incident. It was an emotional response by a client who, though he's held to the standards of an attorney, nonetheless is not an attorney and was under tremendous amount of pressure. That said, the court did not have to do too much, as it was shown, to deal with the situation. And the court didn't do anything other than, well, it did warn him and it did instruct the jury. I'm not saying he didn't do anything, but could have done more because what I think the court did, and I say with respect, this is a fine trial judge. The court didn't, I don't think, gave enough weight, put enough weight into the nature of how important these rights are. And they cannot be disregarded that way, perhaps. So in that light, I think you have sort of a flip side of the coin. Both rights are implicated by the acts of my client. They didn't rise to the level that required the court action that it ultimately took. And therefore, the same analysis, I think, applies. And for those two independent reasons, and perhaps they exacerbate the situation. One supports the other, in other words, makes it even worse. Perhaps, and harm not required in the first instance of self-representation and prejudice existing in the fact that the jury saw my client no longer in the courtroom. There might have been one or perhaps two violations with respect to this trial in my client. I also, I don't know if the court has any questions on this point, but I could go on to another point in the court. You did say you're done. You'll have some time to go. Thank you, sir. Okay. Mr. O'Donnell. Good morning, and may it please the court. Andrew Gould for the United States. This case presented the district court with a host of challenges and objections. Challenges and objections that arose before trial, during the first trial, during the second trial, and finally at sentencing. At each step of the way, the experienced district judge ably handled each of these challenges and objections. And he ensured that the defendants got what the Supreme Court has repeatedly stated the constitution guarantees. Not a perfect trial, but a fair trial. The district court's judgments should be affirmed. Your honors, as you're aware, there are 11 issues and numerous sub-issues, and I don't intend to address each of them during my time. Instead, I'm going to address some of those that came up most heavily during the appellant's presentation. Of course, if the court has any question about any of the issues at any time, please interrupt me, and I'm happy to discuss them. Would you go immediately to the troublesome matter of these extracted phone conversations, and how the government assured the court that these matters, that they were part of a faithful, accurate, and reliable description of the conversations that were recorded on the phones? Yes, Your Honor. Excuse me, I apologize. Maybe I should have studied some more, but I couldn't find a clear expression of how that's supposed to work, and why that would be acceptable. That's a reliable report of what was on those phones. Yes, Your Honor. And I think there is a bit of confusion about the facts, and this relates to our timeliness argument, and why we have argued that the confrontation objection was untimely. Mr. Polk just suggested that to you all, that there was almost, it sounded to me like a detailed objection about reliability and accuracy, and there wasn't. I mean, I'd refer you directly to the record. This is at ROA 2861, and I can read you directly. This is the first time that it came up, and counsel says, I would like to re-urge my objection as to the extraction report on confrontation cause grounds, and this is not the appropriate witness for the extraction report. The court said, do you want to respond to that? That's already been ruled on, I believe. The prosecutor said, I think so. I can represent to the court. It actually never had been objected to. I've gone through the record numerous times. This has never been objected to. After the prosecutor says, I think so, the court says, but in any event, what's your response? The prosecutor says, in any event, the agent took the extraction report, compared it to the telephones to make sure that was in the telephone, was on the extraction report. The court says, okay, further objection, and Mr. Polk's counsel says, no, your honor, and that's it, and I think this is why we've argued vigorously at the beginning of our brief, not that we're afraid to defend it on the merits. We're happy defending the confrontation issue on the merits, but why it's important to understand the lack of timeliness. In the Southern District of Texas, Local Rule 55.2 requires objections to come seven days in writing before trial. We disclosed in our first exhibit list, before the first trial, and this is at ROA 574 and 75, that we were only introducing the excerpted extraction reports. The full extraction reports were never introduced into evidence. They were given to the defendants as part of discovery, and you can see that at ROA 3005 through 3008, where Mr. Scott's counsel confirms as much. But only the excerpted reports were introduced into evidence. Before the first trial, Judge Werlein had a final pretrial conference. At ROA 1962 and 63, he says, I will handle any – he asks the attorneys to come one hour before vore dire begins, to go through the objections. And he says, those that aren't objected to will come in, and those that are will be addressed at trial. There was never any objection to the excerpted extraction report. Fast forward to the second trial, and before the second trial, Judge Hittner holds a final pretrial conference. And at 2250, he notes the defendant's objections to the government's amended exhibit list. Again, which included only the excerpted reports. There was never an objection to the excerpted reports. So when Mr. Polk, in his reply brief, refers to how Judge Hittner says at ROA 2265 that all the court's former rulings remain in place, well, that's just a court saying what Judge Werlein had already said, which was bring your objections beforehand. Now, it's true that at the beginning of trial, when the government introduced its first exhibit, the government moved to introduce an exhibit, and this is at ROA 2629. The court says, I know there are no objections about Local Rule 55.2, but what I'll do is, if there's not an objection, you can assume it's in. If there's an objection, I'll handle it at that time. But respectfully, that's not a license to sandbag the government. Had we known that there was any objection to the excerpted reports, we could have taken appropriate action. We could have brought the original analyst who just plugs in the phone to the Sella Bright report. We could have sought a stipulation. We could have done any of these things, and there's this talk of authenticity and reliability. What's interesting is that during Mr. Polk's cross-examination of Agent Coughlin, who was there to testify about the record he created, the excerpted report, not once, not once is there any question about the reliability or the authenticity of the extraction reports. And they can say, well, that's because he didn't create it. But that's not to stop them from asking him the question about it. Only Mr. Scott's counsel was the one who asked questions about the process of creating the excerpted extraction reports at 3005 to 3008. Our view is that this objection is untimely, but again, we're happy defending it on the merits for two reasons. First, now I understand for the first time, their objection seems to be to the original extraction report, the full extraction report. Well, that wasn't introduced into evidence. The jury never got it. Again, Mr. Scott's counsel at ROA 3005 to 3008 confirms they have a copy of it because he tells Agent Coughlin, if I thought you had left out anything from this report, I could question you about it. But in any event, even if the full extraction reports were in the record, you know, and this goes to the questions that Mr. Polk's counsel is having with Judge Duncan, these are truly just machine generated materials. All it requires is, yes, it's a Cellebrite process of plugging in the phone to the Cellebrite extraction machine and it runs a report. Next, the cases that are cited in the 28J letter, all are about whether such testimony is to come in as expert testimony under Rule 702. They're completely an apposite. And in fact, in kind of going through it, I found another case, and this is United States versus Montijo Maizunet. This is at 974 F3rd 34. I point directly to page 48 in footnote 12. This is from the First Circuit in 2020. It's a published opinion. And there, the First Circuit says this isn't something that needs to be expert opinion. But ultimately, this is beside the point. Because even if, for example, I'm the one testifying at trial about the extraction report, and I'm not an expert, let's just say an agent tells me here's what you do. You just plug it into the phone, press these buttons, and it spits out the report, right? Well, what the report spits out is still machine generated. Yes, you can say, well, Mr. Gould, he doesn't know how to do it, and so it's unreliable. But actually, that argument harkens back to the pre-Crawford Ohio versus Roberts days of judging confrontation by reliability, which is what Crawford explicitly overruled. You know, Crawford, the focus is on is this a testimonial statement? A machine generated statement, whether it's accurate or inaccurate, it's still the machine generated statement. And so it doesn't fall within the ambit of the confrontation clause. Now, how does – what is generated from Celebrite, how does it compare to the data that the Supreme Court rules was problematic in cases like Melendez-Diaz and Bullock-Hammond? We think they're distinguishable, Judge Duncan, and that's because in those cases, the reports required independent analysis. So let's take them in order, right? In Melendez-Diaz, it was a gas chromatography analysis. But the report had – excuse me, the analyst had to certify to an ultimate conclusion. The drug is cocaine. So the analyst was making a conclusion. In fact, there actually had to be a certification that I believe was notarized in their certifying as to the analyst's conclusion. Bullcoming, similar. DWI, and it had to do with the defendant's not just his blood alcohol content, but whether any of the materials had been tampered with and chain of custody issues. And again, the analyst had to certify as to those. That is a far cry from a Celebrite extraction report. A Celebrite extraction report is just like a GPS report, like a tower dump. It's like any of these purely machine-generated things. There is no independent analysis. Again, you can question whether the person conducted the Celebrite extraction accurately. But even then, Melendez-Diaz says, and I'm going to quote, it is not the case that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device must appear in person as part of the prosecution's case. So again, we recognize, obviously Bullcoming, Melendez-Diaz, Crawford, they're all persons that this court is bound by, but it's distinguishable. And that's why we point to all the other, this court's opinions, recognizing how every other circuit to address this issue finds that purely… to start off by showing that these extraction devices will produce a reasonable result. I believe, usually they never object to that missing step in this process. But it's very uncomfortable for us to be dealing with this and having nothing in the record to explain how a machine-operated extraction process works and why the courts should accept it. If I understand your question, Judge Dennis, again, that just goes back to that. We never thought this was an issue, and I would direct the court to ROA 2848 and 3005. These are two instances in which Mr. Scott's counsel recognized that they agreed to the excerpted report, to the introduction of the excerpted report. I understand, but how long would it have taken you to put on a simple explanation of how these things work and why they should be acceptable, acceptable, admissible evidence for a jury to consider in a murder-robbery case? Judge Dennis, we could – if the question is could we have put on a witness who did the original extraction itself, could we have done that? Sure, and now seeing what's happened in briefing and kind of all the arguments that have come up about almost casting aspersions on our conduct, even though we don't think there's any confrontation here, we probably would have done this. I would point out that Crawford in a footnote points out in a footnote how it assumes that defense counsel aren't lodging these objections in bad faith, that they're doing so because they have legitimate questions about the reliability and authenticity. And which they were never – Agent Cawthon got zero questions about it at trial. And again, yes, you can say, well, he wasn't the one who did the device, but he was there, and they could have said, well, how do you know it's reliable? How do you know it's accurate? What do you know about Cellebrite? Yada, yada, yada. It never came up. It's coming up now really for the first time on appeal. And so again, I agree with you, Judge Dis. We could have put somebody on, but we didn't. It wasn't at issue below. I take your argument on that. What about the agent's interpretation of some of the terms in these conversations that were arcane, underworld-type terms? He interpreted to the jury that he was not ever qualified as an expert to do that. Was he? No, he was not. And in fact, had we qualified him as an expert to do that, we would have probably run into reversible error under Haines, which is cited in the government's brief. This goes to the issue of whether his, Agent Coughlin's interpretation of the code words like commissary, savage mode, et cetera, were within the permissible bounds of Rule 701. And we've cited time and again this court has held, Staggers, Haines, et cetera, that it is permissible for an agent to bring his knowledge based on his extensive experience on a case to interpret certain terms. And it's unquestioned here, Agent Coughlin's extensive experience. So to get back to your question, I don't think that the terms are necessarily arcane. I mean they're specific to these individual criminal defendants. But again, had we moved to certify him as an expert, that would have been the problem that led to this court finding error in Haines, where the government certified the agent both as a lay witness to kind of testify about his knowledge of the case. And then as an expert witness to say, well, I know that these terms mean this in drug terminology. What Haines said is that gives the jury kind of the imprimatur, or excuse me, that gives the agent kind of the imprimatur of I know everything about these code words. And in fact, the district court here still gave an instruction to the jury, which was you've heard, you hear the language, and it's up to you to interpret what that was. So there was no error. And respectfully, we believe that it would have actually been error to try to certify him as an expert. Well, doesn't the fact that nobody objected to his testimony take care of this? I think in many ways it does, Judge Wiener. I think it forfeits it, and it turns it – I'm not saying that they waived the issue, but they certainly forfeited it, which would make it reviewable for plain error. It's true. We've pointed out that there was an objection below by Mr. Scott, I believe. But his objection was to the government's method of interrogation, which was what we were doing at trial was we were playing an excerpt. We were stopping it, having Agent Coughlin say, based on your investigation, what does this mean? And then he would answer what that was, and what Mr. Scott wanted was for us to just play the entirety of the tape at once and then do that. So there wasn't an – even if the other defendants who raised this issue below could benefit from that objection, it wasn't on this basis. But again, even if it were raised below, Staggers, Haynes, Elma Zane, the cases cited in the government's brief show that there was no error whatsoever in Agent Coughlin's interpretation. I'm going to move, with the court's permission, to the sentencing issue, and let's talk about the 924C issue, attempted Hobbs Act robbery. Our position is that under the rule of orderliness, this panel must follow Smith. And under Smith's logic, Smith necessarily dictates that attempted Hobbs Act robbery is a crime of violence. And if the defendants disagree, which they clearly do, then they are free to file a petition for en banc rehearing or to seek Supreme Court review to explain why Smith was wrongly decided. The defendants were absolutely correct. Smith didn't deal with attempted Hobbs Act robbery. It dealt with attempted murder. But look at the cases that Smith quoted and relied upon, Dominguez from the 9th Circuit, St. Hubert from the 11th Circuit, Hill from the 7th Circuit. Dominguez and St. Hubert were about attempted Hobbs Act robbery. Hill from the 7th Circuit was about Illinois attempted murder, and we've cited this case in the government's brief. Ingram from 2020, the 7th Circuit extended its rationale in Hill to attempted Hobbs Act robbery. The rationale in these cases is that if an attempt – excuse me – if a substantive offense is a crime of violence, then an attempt to commit that offense is equally a crime of violence. What I heard in my friend's presentation was disagreement about, well, the attempt – excuse me – the substantial step doesn't have to be a violent act or that it can be a nonviolent act. Well, Smith itself recognizes that. I mean Smith says, explicitly says, and here it's following Dominguez and St. Hubert that the substantial step doesn't need to be nonviolent. I mean that makes sense. After all, it's an attempt. It's an incomplete offense. Really, at the end of the day, the defendants simply disagree with Smith, and they agree with Taylor, which is the case going in the other direction that does support my friend's argument. And they agree with the dissent, Judge Wynn's dissent from the 9th Circuit and Dominguez in those cases agreeing with the defendants' arguments here that attempted Hobbs Act robbery is not a crime of violence. And our position is simply that under Smith, which this panel must follow, that ends the issue. And so again, they are free to seek further review of Smith and argue to the en banc court why it should overrule Smith and why it should follow Taylor and the panel and Dominguez. But aside from that, there's nothing more for this panel to do on that issue. If there are no further questions on the 924C issue, let me turn to the murder cross-reference. And it was conceded early on that Judge Hittner here said the quote-unquote magic words, if you will, from Shepard, this court's opinion on Shepard, making clear that even if he had applied the cross-reference in error, this would still be the same sentence. He would still give the same sentence. They conceded it would be harmless so long as the 924C conviction stands. We agree with that. Certainly, if this court – we don't think this is the case, but if this court were to vacate the 924C conviction, then yes, it would need to be sent back for resentencing. But if you agree with the government that the 924C conviction should stand, then there's no need for this court to reach what the government has conceded are difficult arguments. I mean this raises – the murder cross-reference raises two distinct arguments. The first threshold argument is, is Redrick Batiste, who is a co-conspirator, is he, quote, a victim within the meaning of 2B3.1C? Then the second question is even if he is a victim within the meaning of the guideline, does his killing constitute felony murder under 18 U.S.C. 1111? And that would require – to determine that, that would require this court to be the first among any federal circuit courts insofar as I can tell any federal court whatsoever to determine whether 18 U.S.C. 1111 implements the agency theory of felony murder or proximate causation. And we think you don't need to reach this again because of harmlessness grounds, and we also don't think separately you need to reach it because of plain error. We respectfully disagree with the defendants that this separate issue is preserved without question. There's no question that the defendants objected to the application of the murder cross-reference. But they did so on the distinct first argument below, which was, is Redrick Batiste a victim under 2B3.1C? They never raised a separate argument about felony murder, agency theory, proximate causation. And under this court's precedence, such as Nerez-Garcia, objecting on a guideline application on one distinct argument does not preserve another, a completely separate theory for review. Holguin-Hernandez doesn't help the defendants. Holguin-Hernandez is the Supreme Court's decision about what it takes to adequately preserve a substantive reasonableness objection. Well, obviously, when a defendant objects below – or excuse me, not when a defendant objects, but when a defendant's counsel says, your honor, okay, we calculated the guidelines. I think the sentence should be 36 months because my defendant, he's really a good guy. He's got a good family. This was his first time, etc., etc. Well, then when it goes up on appeal, you don't need to object again after the court has ruled because you've already implicitly made the argument that the 3553A factors support that. I mean that's quite different from a distinct legal objection, which was never pressed upon below. And Holguin-Hernandez is clear to distinguish between substantive reasonableness and procedural reasonableness, which this falls under. The mere enlargement doctrine, I'd encourage the court to read those cases closely. So far as the government can tell, the mere enlargement doctrine, it's a Supreme Court-specific prudential doctrine that relates to when a question is properly presented before the Supreme Court, when the court itself will consider an argument for it. It doesn't bind lower courts, and the defendants in the reply briefs have cited a host of circuit cases where they say this court has applied the mere enlargement doctrine. With one exception, that's not true. In all but one of those cases, they cite the cases – the mere enlargement cases are cited for a completely different proposition. The one exception is Lampton v. Diaz, where in a footnote in a civil case, this court referred to the mere enlargement doctrine. But it was in the context of whether the defendant has waived versus forfeited an argument, and that's what we're saying here. It's that we're saying the defendants haven't waived this felony murder argument. They've merely forfeited it, which renders it reviewable for plain error. If there are no further questions on the murder cross-reference, let me address Mr. Phillips' arguments about the sufficiency of the evidence. This crime could not have taken place without Mr. Phillips' involvement. Mr. Phillips played a key role in this, and his job was done by the night before the robbery. His job was to recruit Mr. Duncan Bush, the person who was supposed to get out of the car and grab the bag from the messenger who would be shot by Mr. Batiste. But for Mr. Duncan Bush, this robbery cannot take place, so it requires somebody to recruit him, and again, that was Mr. Phillips. And Mr. Phillips' counsel accurately listed all of the many substantial steps we went through. That's enough. I mean that goes well – when you take all those together, that goes well beyond mere preparation, and it corroborates the firmness of the defendant's criminal intent. And again, his job was done. I mean what Mr. Phillips seems to be suggesting is that this court adopt a rule that for an attempted offense, or maybe it's just for an attempted Hobbs Act robbery, the defendant has to be found in the area the day of with the rest of the crew, and that's simply not the case. Again, his job was done. He had already committed the substantial steps. But for Mr. Phillips, there is no Mr. Duncan Bush, but for Mr. Duncan Bush, there can be no robbery. As to the 924C count, they're right that the defendant has to have knowledge that a firearm would be used, and we pointed to three – we pointed to a few things. I mean first of all, this is an armored car robbery after all, so there's just a common sense that somebody would probably be bringing a gun to it. But then we have Mr. Brazel's jailhouse testimony where Mr. Phillips told him explicitly that the plan was to kill the cash carrier and grab the money. Well, how do you kill the cash carrier with a gun? He knew there was a gun, and really the sufficiency argument is really asking this court to view the evidence in the light most favorable to him and not in what the jury heard. The final issues that were addressed were by Mr. Hill, which were removal and the revocation of his pro se status. And here I briefly just say the district court did everything in line with what the Supreme Court has stated he should have done in Illinois v. Allen. Mr. Hill's argument mirrors in many ways the defendant's arguments from United States v. Benebay. This is a Seventh Circuit case cited in the government's brief where the defendants basically said it wasn't that – our behavior wasn't that disruptive. But even if it was, there's a, quote, hierarchy of remedies that the district court must follow before it ultimately chooses removal from the courtroom, and that's simply – that's not the case. Allen explicitly holds that we are giving district courts flexibility in how to handle it. This court can read the record for itself. The outburst occurs from 2747 to 57. It occurs for a long time in which both before the jury enters and after the jury enters, the district court gives him numerous times. And we've said this in the response brief, so I don't mean to be repetitive, but Mr. Hill has said that, well, my standby counsel should have intervened. Well, that's true. His standby counsel didn't intervene, but Mr. Scott's counsel intervened because Judge Hittner had ordered Mr. Hill removed, and Mr. Scott's counsel intervened and said, can I talk to him for a minute? And he did, and Mr. Hill got to stay in the courtroom. And then the next thing is, well, there should have been a recess. Well, there was a brief recess. Did I read the record for what I had correctly that Mr. Hill started to address the jury, and the court told him he couldn't address the jury? But then he went ahead and began to address the jury, and that was when he was taken out of the courtroom. Is that correct? Yes, that's when he was finally removed from the courtroom. Initially, he was ordered removed before the jury came in based on he was badgering the district court, telling the district court to identify the U.S. marshal who found his wife with the razor blade, and the district court refused to do so, which led Mr. Hill to curse at the district court. That's when Judge Hittner initially ordered him removed, but he wasn't removed at that time. The jury came back in, and he started to address the jury, and the court, again, warned him, said, please, you're going to get time for a cross-examination, but he disregarded it. There was no error. Even conceding, if Mr. Hill is right that it was an impulsive and emotional outburst by him, that still doesn't justify his behavior, and that still doesn't mean the district court abused his discretion in ordering him removed. And then when it ordered him removed, it could revoke his pro se status. Again, that's what Illinois v. Allen envisions. Again, I've only addressed, I believe, six of the issues by my count, but the government's happy to rest on the brace unless this court has any further questions that I can answer. We respectfully request that you affirm the district court's judgments. Thank you for your time. Thank you, Mr. Bloom. Okay. All four of you, each of the four defense counsel has three minutes on the phone. First is Ms. Closier. Closier. Closier. Sir, I think she's having some technical difficulties. She seems to be frozen. There we go. Here she is. Ms. Closier. What's frozen? Yes, I think she's having some technical issues, sir. Oh, yes, we completely lost her here. Okay. There she is. She's back. All right. I think she's available now, sir. Ms. Closier. I think I'm available. If something becomes an issue, I can call in. I just had a few things, Your Honors, that I'd like to address. Okay. Thank you, Mr. Bloom. Regarding insufficiency of the evidence, I couldn't find a fifth-circuit case that would support the conclusion that just recruiting Duncan Bush would constitute a substantial step to committing attempted hostage robbery. And the testimony doesn't indicate that he did take a substantial step when he recruited him. When Duncan Bush testified, he said that Phillips asked him if he wanted to make some money, but there was no indication of what that was for at the time. That's on page 3259. The government's also suggesting that the evidence of planning satisfies the substantial step requirement, but case law is very clear that mere preparation is not enough. Planning and preparation are similarly defined in the dictionary. Planning meaning the process of making plans for something. Preparation, something done to get ready for an event or undertaking. Also, knowledge that a potential crime might occur does not prove that the defendant had intent to commit the subsequent offense, which is required to obtain a conviction under the statute. I'd also like to address Judge Duncan's question regarding whether the district court mentioning that it would impose the same sentence even if the things were reversed. Departing from the guidelines is itself an appealable issue, reviewable by abuse of discretion. It's not actually ripe for appeal right now, but if the court were to find error in any of these issues and remand, it would be improper to sustain it on the sense that the court has already said it would give the higher sentence, because that itself would be appealable for abuse of discretion for departing from the guidelines in such a large manner. Also, on the 924C, I'd like to mention that the government conceded just now that the substantial step does not have to be violent, which means that the intent step would have to be violent. But attempted object robbery does not require the government to prove intent. It only requires they prove its intent, and a mental state cannot be violent. I mean, there's absolutely no way to say that. I also believe that the statement in Smith saying that all attempted crimes are crimes of violence is not a holding of that case. It's just a quote in the case in which you guys used to make the decision that attempted murder is a crime of violence. But it was not a direct holding of that case, so I do believe this panel has the ability to vacate the convictions for 924C. And just quickly, I wanted to mention that the government did mention just now that Mr. Phillips did preserve the murder cross-reference argument. They did mention it in their brief that the case cannot be considered a victim. There's a Giseline opinion that you guys already ruled on. I'm sorry? Do you have a question? Okay. Sorry. Real quick. The Giseline opinion that in rare circumstances a court may consider a co-conspirator a victim for sentence-enhancement purposes where the co-conspirator's actions may not have been wholly voluntary. That's already been ruled on. There's no way you could make an argument that Batiste and his actions were not wholly involuntary. He was the leader. So I believe that that, you know, can be reversed. I've run out of time, so thank you. Thank you, Ms. Crutcher. Mr. McGuire for Mr. Scott. Yes, sir. I'd like to address, I think, two main issues. On the confrontation claim, the government continues to argue that the data extractions from these felons are just purely machine-generated. And I think Bollcoming, particularly in footnote one, where the Supreme Court in Bollcoming said that gas chromatography requires expertise, requires following proper protocols, even though a machine is used, in that case, the gas chromatograph, that that is subject to confrontation. Because the procedures can be improperly performed. They can be performed with bias or they can be performed with carelessness. And I think the Rule 20HA letter pointed out that other courts have looked at celebrite data extractions and shown that it requires expertise. It is not something any common layman can perform. It's not like typing into a calculator where you would hit five times five equals and you would always get 25. It requires expertise and training to perform properly. And that should be subject to confrontation to make sure it is performed properly without bias. No different than the gas chromatograph in Bollcoming. So we think the Bollcoming footnote, I think for Mr. Scott, Bollcoming footnote one directly controls here. And that objection was made at trial. The court and Judge Werlein and Judge Hittner both clearly stated on the record they were going to allow trial objections and would rule at that time. That's how the parties proceeded. They did that under that understanding and they made their objections at trial. So it was allowed by the court at the time the court, the government made no local rule objection. So that argument is forfeited. It has been pointed out in the required briefs. The second argument, Your Honor, I would like to make going to the 924C and the government's claim that Smith is controlling. Like our co-counsel, we do not believe Smith is controlling because the Taylor argument was not made in Smith. It was not ruled on in Smith. Smith is a attempted murder case and not an attempted Hobbs Act robbery. So this argument has never been raised. And as we pointed out in our reply brief, we cited two numerous Supreme Court cases that say judicial decisions do not stand as binding precedent. Precedent for points that were not raised, not argued and hence not analyzed. Citing Verdugo-Riquidez, U.S.D., L.A. Trucker, Tucker Truck Lines. And that's in our reply brief at 18. So this issue just hasn't been raised or presented in the lower cases. In the other cases, it's presented here clearly and the court has authority to rule on it and is not bound by the rule of law. And we would ask for a reversal of 924C count on that basis and the murder cross-reference as well. Thank you, Your Honor. Thank you, sir. Yeah, well, first I would like to address the government's assertion regarding the extraction reports. The objection at trial and the objection still is that we weren't able to confront the person that created the extraction report. These they call a pulled-down version of the extraction report. But they were still from the extraction reports that were originally generated. We need to confront and cross-examine that person. The timeliness argument, I believe that that is clear in the record that this was a timely objection. And that we addressed that in our reply brief. I will leave that to our reply brief. That's adequately addressed. And we quoted where they allowed the objections to be made at trial. That was clearly stated by the judges in this case that they were allowed to object at trial to the exhibit. Now, as far as the pulled-down accusation, it's not even clear in this case that it was Coughlin that did pull down his report. The state tried to make it as if that is a clear contention when it is not. He testified that the extraction reports were pulled down to contain information relevant to this trial. But the only citation to the record on appeal that Coughlin was the one that pulled down the analyst report into a condensed version is the record on appeal 3005-08. So an extraction report, if you print it off, would be even bigger than it would be pages and pages and pages. It's like 10,000 pages. So the extraction report is stuff that you found to be relevant, which the government is taking to mean Coughlin directly. But if you go on to the continuing questioning, they're talking about, you consented to extracting the phone. I believe we got a warrant for John's phone. But he consented, he signed a release for you to do so. You may have gotten a warrant for it, but he didn't consent to it. I have to verify that, sir, but I believe that we got a warrant. So he's referring to you as law enforcement, not to Coughlin specifically. So I don't even think that that is clear who was the person that pulled down those reports. Regardless, the person that prepared the extraction reports did not testify. Regarding the fact of, she's trying to say that there was no independent analysis in trying to distinguish this case from those cases, the Bull Cumming and Melendez-Diaz. However, in those cases, there was no independent analysis that was conducted in those cases either. As the dissent pointed out in Bull Cumming, the certifying analyst's role was no greater than that of anyone else in the chain of custody. The information contained in the results was the result of a scientific process comprising of a multi-participant act, each with its own evidentiary significance. They go on to, the dissent referred to the majority requiring the state to call the technician who filled out a form and recorded the results of the test a hollow formality. In Melendez-Diaz versus Massachusetts, the affidavit submitted by the analyst contained only the bare-bones statement that the substance was found to contain cocaine. And that was the result from a machine-generated test. At the time of the trial, the petitioner did not know what test the analyst performed, whether those tests were routine, and whether interpreting those results required the exercise of judgment or the use of the skill, as the analyst might not have suggested. And I believe I'm out of time. Thank you, judges. Thank you. Finally, Mr. Martinez for Mr. Hill. Yes, Your Honor, thank you. I just mentioned a few things. The government cited Illinois versus Allen. But let me, I would like to respectfully mention something about that case. In that case, the level of disruption engaged in by the defendant was significantly more intrusive than what my client did. He told the court he would behave and didn't after not one, but maybe two or three chances. His instruction was a little more violent. So the defendant in Illinois versus Allen was allowed to get away with a lot more. Now, ultimately, the court said he couldn't do it. And that case supported the government's position that in that case, self-representation should be denied. But in this case, it didn't even reach, not even a halfway point. More significantly, in that case, the judge allowed a lot more and did a lot more to attempt to remedy the situation and preserve his self-representation right. And he was very patient and he did everything he could. And I contend in this case, the judge did things, but perhaps he could have gone a little bit more patient. Second point I'd like to raise is, yes, my client did attempt to address the jury. No question about that. But he never did. And the court interrupted him and rightfully, at that point, removed him. But it could have been a temporary removal, which ultimately it was, but it was longer than it could have been. But at that point that he was removed, even for a short period of time, apparently his behavior subsided. Because he returned and throughout the trial, no more incidents. In addition, the court perhaps should have perhaps not denied him the right to represent himself even after they returned him. Another decision had already been made. Maybe he could have retracted it or maybe not made it at all after he removed him. And then finally, what is crucial, the case law says that it's very crucial in this decision. Respectfully, the court's decision is, did the client have a tactical or strategic motive in doing what he did? In other words, it requires a deliberative act of his part to gain an advantage against the government. And I contend it was an impulsive, emotional, one time isolated instance that was a response to his familial tie and what happened to his wife. He thereafter complied with everything the court required. And perhaps the removal of his right to self-represent himself, that in particular, was a bit premature. Thank you. That concludes our argument in this case. This case will be submitted.